CHICAGO & N. W. RY. CO. (PIEK v.). See Case No. 11,138.

CHICAGO & N. W. R. CO. (SAYLES v.). See Cases Nos. 12,414 and 12,415.

CHICAGO & N. W. R. CO. (WHITON v.). See Case No. 17,597.

CHICAGO & P. R. CO. (CHICAGO & N. W. R. CO. v.). See Case No. 2,665.

CHICAGO & S. R. CO. (SMYTHE v.). See Case No. 13,135.

CHICAGO & S. W. RY. CO. (DOWS v.). See Case No. 4,048.

## Case No. 2,666.

### CHICAGO, B. & Q. R. CO. v. ATTORNEY GENERAL et al.

[2 Cent. Law J. 335;[1]  9 West. Jur. 347.]

Circuit Court, D. Iowa. May 12, 1875.[2]

LEGISLATIVE POWER TO REGULATE RAILWAY TARIFFS—STATE REGULATION OF RAILWAYS—LEGISLATIVE RESERVATION OF RIGHT TO MAKE RULES AND REGULATIONS — VALIDITY OF ACT WHICH PRESCRIBES DIFFERENT RATES FOR DIFFERENT ROADS.

1. Where a railway company has been organized under a general law of a state, which confers upon such companies "the power to make contracts," but does not in express terms confer on them the exclusive power to fix their own tolls and compensation, the state may afterwards pass laws regulating such tolls and compensation.

[See note at end of case.]

2. The United States granted to the state of Iowa certain lands for the purpose of constructing a described railway within the state. The legislature of Iowa accepted the trust, and conferred the donation upon a particular company, with the reservation that such company should at all times be subject to such rules and regulations as might from time to time be enacted and provided by the general assembly, "not inconsistent with the provisions of this act, and the act of congress making the grant" [11 Stat. 9]. Held, that this was an express reservation, on the part of the state, of the power to regulate the compensation which should be received for the carriage of freight and passengers over such road.

3. A state law which divides the railroads in such state into different classes, based upon the amount of the earnings per mile, and which prescribes a rate of charges for the roads of each class different from the rates prescribed for each of the other classes, is not obnoxious to a constitutional inhibition against the passage of laws not uniform in their operation.

[See note at end of case.]

Bill [against M. E. Cutts, attorney general, and William Christy, treasurer, of the state of Iowa, and Daniel Campbell] for an injunction.

On the 23d day of March, 1874, the legislature of the state of Iowa passed an act entitled, "An act to establish reasonable maximum rates of charges for the transportation of freights and passengers on the different railroads of this state." Acts 1874, p. 61. This act classifies all of the railroads within the state, according to their gross annual earnings per mile, and provides in substance that railroads earning $4,000 per mile and over (Class A.) shall not charge more than 90 per cent. of the fixed rate; that roads earning $3,000 per mile (Class B.) shall not charge over 5 per cent. above the fixed rate; and roads earning $2,000 per mile (Class C.) shall not charge over 20 per cent. in addition to the fixed rate; and that they shall not charge respectively for passengers more than: Class A., three cents, Class B., three and one-

---

[1] [Reprinted by permission.]

[2] [Affirmed in Chicago, B. & Q. R. Co. v. Iowa, 94 U. S. 155.]

half cents, and Class C., four cents per mile. The present suit is brought by the Chicago, Burlington and Quincy Railroad Company, of Illinois, as the lessee in perpetuity; under legislative authority, of the Burlington and Missouri River Railroad Company of Iowa, to enjoin suits by the attorney-general of the state, for the enforcement of the above mentioned railway tariff act of March 23, 1874. The bill rests upon the ground that the act last named is in conflict with the constitution of the United States, in that it impairs the obligation of a contract, and is also a regulation of inter-state commerce; that it is also repugnant to the constitution of the state, for the reason that it does not affect all railroads alike, and is therefore not of uniform operation; and for the further reason that it conflicts with section 1 of the bill of rights. The answer admits most of the allegations of the bill, but denies that the B. and M. R. R. Co., either by the charter or the laws of Iowa, had the exclusive right and power to fix its rates of fare, and denies that any attempt is to be made to enforce the law, so far as regards inter-state commerce. It is averred in the answer that, if the B. and M. R. R. Co., ever did have such exclusive right, it yielded such right by its acceptance of the land grant in A. D. 1856, under the conditions stated in the act granting said lands. That since the original charter was granted, and after the adoption of the new constitution of Iowa in A. D. 1857, said charter has been amended in many material respects; and that by the acceptance of such amendments the charter became subject to amendment or repeal by the general assembly, under the provisions of said constitution conferring that power and right upon the general assembly; and that it especially applies to the Red Oak Branch, which was constructed by virtue of an amendment to the charter made in A. D. 1869; that as to the other branch roads, they were constructed by the aid of taxes levied and collected in various townships under the act of 1870, which provided that all roads constructed by such aid "shall be subject to the control of the general assembly, in regard to management of the same, and the charges for transportation of freight and passengers." On the bill, answer and certain exhibits and affidavits, the complainant moves for the allowance of a temporary injunction to restrain the enforcement of the act of March 23, 1874.

O. H. Browning, D. Rorer, and James Grant, for complainant.

M. E. Cutts, Atty. Gen. of Iowa, and W. H. Seevers, for respondents.

DILLON, Circuit Judge. Whatever rights the complainant corporation has are derived from the Burlington and Missouri River Railroad Company. It will be conceded for the purposes of the present application that the complainant possesses all the franchises, rights and powers of the Burlington Company, and is entitled to the relief here sought if the last named company would have been entitled thereto, if it were itself using and operating its road. An enquiry into the rights of the Burlington Company as respects compensation for services rendered by it, becomes necessary. This company was incorporated in 1852. The constitution of the state then in force provided that "corporations, except for political or municipal purposes, shall not be created by special laws, but the general assembly shall provide, by general laws for the organization of all other corporations." Under this provision of the constitution the legislature, in 1851, passed a general act for the creation of corporations for pecuniary profit, including railway corporations. No express power to alter or annul the articles of association of companies organized under the act, was reserved. Code 1851, art. 43, pp. 108, 109. It was under this general incorporation act that the Burlington Company was organized in 1852. By this act it was provided (Code 1851, § 673), that "any number of persons may associate themselves and become incorporated for the transaction of any lawful business, including the establishment of ferries, the construction of canals, railways, bridges, or other works of internal improvement; but such incorporation confers no power or privilege not possessed by natural persons, except as hereinafter provided." The next section (674) enumerates the powers of corporations organized under this act as follows: "(1) To have perpetual succession. (2) To sue and be sued by its corporate name. (3) To have a common seal which it may alter at pleasure. (4) To render the interests of the stockholders transferable. (5) To exempt the private property of its members from liability for corporate debts except as herein otherwise declared. (6) To make contracts, acquire and transfer property, possessing the same powers in such respects as private individuals now enjoy. (7) To establish by-laws and make all rules and regulations deemed expedient for the management of their affairs, in accordance with law, and not incompatible with an honest purpose." This, then, is the extent of the corporate powers and franchises of the company; and they are but little greater than those which the law "tacitly, and without any express provision, considers inseparable from every corporation," created for a like purpose. Ang. & A. Corp. § 110; 2 Kent, Comm. 224. The complainant seeks an injunction in this case, not on the ground that the maximum rates of charges allowed by the act of 1874 are unreasonable, but on the ground distinctly asserted in the argument, that the company has the exclusive power to fix the measure of its own compensation, and con-

sequently that such an enactment as that of 1874 is a violation of its chartered rights.

In considering this claim of the company, it cannot fail to arrest attention that the statute nowhere in terms confers upon railway corporations organized under it, the power to fix or regulate their charges. We have, then, to deal with a case where the legislature has not expressly delegated to the company the power to fix its own tolls or compensation. When we consider the rule of construction, as it is definitely settled in Great Britain and by the courts of this country, that any ambiguity or fair doubt in the charters of corporations, operates in favor of the public, and that a corporate body can claim nothing not clearly granted, it is quite plain that the general power "to make contracts, the same as individuals," cannot be held to amount to a contract between the state and the company, that the latter should exclusively and permanently prescribe and regulate its own charges. The surrender of legislative power beyond recall, in so important a matter, can not, in my judgment, be implied from any such general language. Undoubtedly the railroad company may demand compensation for its services. It can not be imagined that the legislature supposed the capital necessary to construct and operate railroads would be invested therein except for the hope of profit to be thereby realized, and there is no source of profit to a railway company except its earnings for the transportation of persons and property. I have no difficulty, therefore, in holding that the legislature, either by the express power "to make contracts," or, what seems the more satisfactory ground, by just and necessary implication, did authorize railway corporations to demand and receive compensation for their services; but this is far short of conferring upon them an exclusive power in this respect, and one beyond future legislative control.

In all civilized countries the duty of providing and preserving safe and convenient highways to facilitate trade and communication between different parts of the state or community, is considered a governmental duty. This may be done by the government directly, or through the agency of corporations created for that purpose. The right of public supervision and control over highways results from the power and duty of providing and preserving them. As to ordinary highways these propositions are unquestioned. But it is denied that they apply to railways built by private capital and owned by private corporations, created for the purpose of building them. Whoever studies the nature and purposes of railways constructed under the authority of the state by means of private capital, will see that such railways possess a two-fold character. Such a railway is in part public, and in part private. Because of its public character, relations and uses, the judicial tribunals of this country,

state and national, have at length settled the law to be that the state, to secure their construction, may exert in favor of the corporation authorized by it to build the road, both its power of eminent domain and of taxation. This the state cannot do in respect of occupations or purposes private in their nature. A way thus authorized and established is intended for the public use and benefit, although the capital is furnished by the corporators or shareholders, and the tolls belong to them. In its public character a railroad is an improved highway or means of more rapid and commodious communication, and its public character is not divested by the fact that its ownership is private. These general views have been asserted by many state courts, but in this court it is sufficient to refer to the judgments of the supreme court of the United States, in the cases of Olcott v. Supervisors, 16 Wall. [83 U. S.] 678; Council Bluffs & St. J. R. Co. v. County of Otoe, 16 Wall. [83 U. S.] 673; and the very recent cases known as the Topeka and Iola Tax Cases [Citizens' Sav. & Loan Ass'n v. Topeka, 20 Wall. (87 U. S.) 655; Commercial Nat. Bank v. Iola City, 22 U. S. (Lawy. Ed.) 463], the opinions in which were given by the presiding justice of this court. In its relations to its stockholders, a railroad or the property in the road and its income is private property, and subject to the lawful or reserved rights of the public, is invested with the sanctity of other private property. The distinction here indicated marks with general accuracy, the extent of legislative control, except where this has been surrendered or abridged by a valid legislative contract. Over the railroad as a highway and in all its public relations, the state, by virtue of its general legislative power, has supervision and control; but over the rights of the shareholders, so far as these are private property, the state has the same power, and no greater than over other private property. The power which the state may legitimately exercise over railways within it is subject to such further restrictions as it may have consented to by express grants in charters in respect of which no power of repeal or alteration is reserved, and by the commerce clause of the federal constitution, which withdraws interstate commerce from state control, and confines the state to the regulation of its internal traffic. As our railroad system is made up of links supplied under the authority of the several states, it may admit of doubt in our present knowledge, whether a power in a state thus limited can be beneficially exercised; but this is a legislative problem and not a judicial question.

Without further enlarging upon the public nature and uses of railways, or undertaking to review the authorities cited, or examine the positions assumed by counsel, which would necessarily lead through a broad field of discussion, I content myself, on this branch

of the subject, with stating as my conclusion, that the legislature has not expressly conferred upon railway corporations in this state the exclusive power to fix their own charges; that such a power cannot be deduced by implication from the constituent act of the corporations, and that whatever powers are conferred in this respect, are subject to an implied condition that they shall not be oppressively or unreasonably exercised, and also subject to the future exercise of the police regulations of the state, or any other power possessed by the state, properly legislative in its nature, which includes the power to regulate, consistently with the charter, all of the franchises granted, and to prescribe and limit the amount of toll or charges which it shall be lawful to take.

This view, if sound, is decisive of the case against the railroad company. But if we should concede it to be erroneous, and that the company originally possessed chartered rights which the act of 1874 would violate, still it has surrendered any such right by its acceptance of the act of July 14, 1856. On the 15th day of May of that year, congress made a grant of lands to the state of Iowa, "for the purpose of aiding in the construction of a railroad from Burlington, on the Mississippi river, to a point on the Missouri river, near the mouth of the Platte river." The state could dispose of the lands for the sole purpose of building the line of railway, but it had the absolute power to select the company which should receive the benefit of the grant. The legislature accepted the trust by the act of July 14, 1856, and by that act gave the benefit of the grant to the Burlington Company upon condition that it should assent to the provisions of that act, which it did. Among the provisions of the act thus assented to by the company was the following: "That the company accepting the provisions of the act, shall at all times be subject to such rules and regulations as may from time to time be enacted and provided by the general assembly of Iowa, not inconsistent with the provisions of this act, and the act of congress making the grant." Rev. St. 1860, § 1311. The state of Iowa sustained towards these lands the relation of trustee of the general government, and in that capacity could not divert or change the trust, but it also sustained towards any company on which it should confer the benefits of the grant the relation of a sovereign, and as such was capable of enacting any valid law whatever, not in conflict with the act of congress making the grant. The state had the power, therefore, to say to the donee of its bounty, we will give you the benefit of this grant of lands provided you will agree to be at all times subject to such rules and regulations as the general assembly may enact. The company accepted the grant, and thereby agreed to be subject to this condition. The only question, then, is as to the

extent of the power recognized or given by the words "rules and regulations." The interpretation of these words must depend upon their occasion and purpose. The occasion was an important one, both for the company and the state. The company was made the beneficiary of a large and valuable grant of lands. The state was endeavoring to secure for the benefit of the public the building of an important highway or line of communication from the Mississippi to the Missouri river.

Doubts as to the extent of the power of the state over the corporation, under the then existing legislation, suggested the provision in question, and it was undoubtedly the design of the legislature to secure a substantial right to the state, or a recognition by the company of such a right in the state. It is to be regretted that words were not used which would admit of no dispute, but as it is we must interpret those employed so as to effectuate the intention of the parties. Some aid to interpretation is afforded by the decisions of the supreme court of the United States, in respect to the word "regulate" as it occurs in the federal constitution. These are referred to in the recent case of Hamilton v. Dillin [Case No. 5,979]. In this case it was held under the act of July 13, 1861 [12 Stat. 257], that power to authorize commercial intercourse, during the rebellion, "to be conducted and carried on only in pursuance of rules and regulations prescribed by the secretary of the treasury," authorized the secretary to impose, as a condition of cotton permits, a tax of four cents a pound on cotton purchased. The following observations of Mr. Justice Bradley, in the case last cited, are pertinent to the case in hand. The learned judge says: "It is contended that the imposition of the bonus of four cents per pound was not a 'rule' or a 'regulation' within the fair meaning of the act; and it is conceded that in many cases the power to make rules and regulations on a particular subject is a limited power, having respect to mode and form, and time and circumstance, and not to substance. But it also must be conceded that in other cases the power is much more extensive and substantial. Thus in the constitution, the several powers 'to regulate commerce,' 'to establish a uniform rule of naturalization,' 'to make all needful rules and regulations respecting the territory or other property belonging to the United States,' are understood to give plenary control over those subjects. The power to regulate commerce has been held to include the power to suspend it (1 Kent. Comm. 432); and the power to make rules and regulations respecting the territory of the United States, has been held to include the power to legislate for and govern such territory and establish governments therein. [M'Culloch v. Maryland] 4 Wheat. [17 U. S.] 422; Story, Cont. § 1328. The extensive effect given to these clauses is undoubtedly largely due to

the character of the instrument and that of the donee of the powers, to wit, the legislature of the United States, to whom the grant of a power means the grant of a branch of sovereignty. It shows, however, that the rule of construction depends, at least, in some sort, upon the nature of the subject-matter. In the case before us, the power of the government to open and regulate trade with the enemy was intended to be conferred upon the president and secretary of the treasury. The power of regulation in such a case is to be taken in the broadest sense, and, in our judgment, included the power to impose such conditions as the president and secretary should see fit."

So, in the case before us, the legislature of the state is the donee or possessor of the power to make the rules and regulations in question, and the power is to be construed accordingly, and not in a narrow and technical sense. Any construction that deprives words of a substantial purpose or meaning, would plainly thwart the purpose intended to be effected. The words, when carefully considered, satisfactorily evince a purpose of subjecting the companies to the control of the legislature. The language is that "the company accepting the grant shall, at all times, be subject to such rules and regulations as may, from time to time (that is, as occasion arises), be enacted and provided by the general assembly of Iowa," and the only limitation named is, that they shall not be inconsistent with the act of July 14, 1856, or the land grant act of congress. Such rules and regulations are, necessarily, laws. Referring to this subject, counsel say that these words "can justly be construed only to refer to what is called the public and general management of the road as a highway, and not to change the vital, life-giving principle of the charter to the corporation, to regulate its own tariffs." But the power to regulate the public and general management of the road as a highway existed before, and the interpretation suggested is open to the objection of making an important provision to which the company was expressly required solemnly to assent, useless and unavailing. The legislature, by this provision, meant, in my judgment, to put at rest any question that might then exist as to the subordination of the corporations accepting the grant to the legislative power of the state, so far as, consistently with the preservation of their franchises, the public good might from time to time require.

The act of 1874 is not void for want of uniformity, or because it does not prescribe a uniform rate for all railroads in the state. There may be good reasons connected with the cost of construction and expense of operating, and the amount of earnings, why railroads of one class should be allowed to charge more than roads of another class. The law is uniform in its operation upon all roads in each class; and similar acts, as for example dividing cities into classes, with different powers, are not uncommon in our legislation, and their validity has been sustained by the courts. The cases cited in the brief of the attorney general fully establish this proposition.

I need not discuss the objection made by the bill to the act of 1874, as interfering with inter-state commerce, since the answer expressly disclaims any intention to enforce, or attempt to enforce, the act in this respect. Injunction denied.

[NOTE. Plaintiff appealed to the supreme court, which affirmed the decree herein, holding, per Waite, C. J., that complainant was subject to legislative control as to its rates, there being nothing in its charter to prevent legislative interference; that the right to regulate such rates was not lost by failure to exercise it; and that the statute of March 23, 1874, was not repugnant to the constitution of the state, or that of the United States. Chicago, B. & Q. R. Co. v. Iowa, 94 U. S. 155, 163.]